Joseph FAMA, Petitioner–Appellant,

v.

UNITED STATES of America,
Respondent–Appellee.

No. 991, Docket 89–2469.

United States Court of Appeals,
Second Circuit.

Submitted April 4, 1990.

Decided April 25, 1990.

Joseph Fama, petitioner-appellant, pro
se.

Joan Azrack, Brooklyn, N.Y., Asst. U.S.
Atty., E.D.N.Y. (Andrew J. Maloney, U.S.
Atty., E.D.N.Y., Matthew E. Fishbein, Emi-
ly Berger, Asst. U.S. Attys., of counsel),
for respondent-appellee.

Before FEINBERG, TIMBERS and
WALKER, Circuit Judges.

WALKER, Circuit Judge:

Appellant Joseph Fama, a federal prison-
er proceeding *pro se*, appeals from an Octo-
ber 10, 1989 order of the United States
District Court for the Eastern District of
New York (Charles P. Sifton, *Judge*) deny-

**1176**

ing his motion to vacate his plea, conviction and sentence pursuant to 28 U.S.C. § 2255. On July 26, 1985, after several previous appearances by Fama at which he allocuted to the plea and at which certain understandings of the plea agreement were placed on the record, Judge Sifton accepted Fama's guilty plea to a single count charging him with conducting a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848. Immediately thereafter, consistent with the court's understanding of the plea agreement, Judge Sifton sentenced him to a twenty-year prison term, a $100,-000 fine, a $50 special assessment, and the forfeiture of money seized at the time of his arrest.

In his Section 2255 petition, Fama claims (1) that his guilty plea to the CCE offense was improperly accepted because it lacked an adequate factual basis regarding the element of managing five or more people and because Fama never allocuted to managing the five family codefendants listed in the indictment; (2) that he was not fully informed of the elements of the charge against him and the full penal consequences of his plea; (3) that the imposition of a $100,000 fine violated the plea agreement; and (4) that Judge Sifton impermissibly participated in plea agreement discussions and thereby improperly influenced his plea.

Because we find each of these contentions to be without merit, we now affirm.

## BACKGROUND

Fama was indicted along with his wife and four adult children after a seizure from his Brooklyn home of multi-kilo quantities of heroin, cocaine and marijuana, twenty-eight firearms, and three million dollars. Fama was charged with conducting a continuing criminal enterprise, as well as conspiracy to distribute heroin and cocaine and possession with intent to distribute heroin and cocaine.

On April 22, 1985, Fama offered to plead guilty to the CCE charge pursuant to a plea agreement. Under this original agreement the government promised that, *inter alia*, Fama would not be prosecuted for any other charge presently pending against him; Fama would be sentenced to a period of incarceration of between ten and twenty years; no fine would be imposed; and Fama would pay a $50 special assessment. No plea was taken on the basis of this agreement, however. Before the court decided whether to accept the plea, it learned that the U.S. Attorney for the Southern District of New York would not agree to a stated promise in the plea agreement not to subpoena Fama to testify before a grand jury in the Southern District.

On May 17, Fama again appeared before Judge Sifton to enter a guilty plea pursuant to a modified plea agreement, which eliminated the provision preventing subpoena by the U.S. Attorney for the Southern District. This time, however, Judge Sifton decided not to accept the plea when, after engaging Fama in the required allocution, he remained uncertain about the plea's voluntariness and factual basis. The judge expressed concern that Fama was pleading only to receive the benefits of the agreement, and that Fama had not identified the five persons he managed and had given only a minimal description of his criminal activities.

On May 20, Fama appeared once again asking the court to accept a plea based on an agreement. According to the government, the sole condition of the agreement at that time was that Fama's maximum period of incarceration would be twenty years, although Fama now claims that he had reasonably understood that the promise that no fine would be imposed was still in effect. The court then conducted an allocution, the adequacy of which Fama now disputes, designed to insure that Fama understood the consequences of his entering a guilty plea, and to assess the voluntariness of and factual basis for the plea. The court stated that it would continue to consider whether the plea should be accepted, based in part on the presentence report.

On July 26, 1985, the scheduled sentencing date, the court entertained a motion by Fama for specific performance of portions of the original April 22 agreement, notwithstanding their absence as of May 20, and

ruled that it would enforce only those provisions relating to immunity from further prosecution in the Eastern District of New York and the District of Maryland, and immunity from criminal and civil tax proceedings. Judge Sifton then stated that he would accept Fama's plea and, after affording Fama a final opportunity to withdraw the plea, imposed sentence as described above. No contemporaneous objection was raised to the sentence imposed.

## DISCUSSION

■ Fama first argues that his naming of six individuals to whom he gave heroin on consignment, as opposed to his five family members named in the indictment, formed an insufficient factual basis for his plea of guilty to the CCE count. We disagree. " '[A] reading of the indictment to the defendant coupled with his admission of the acts described in it [is] a sufficient factual basis for a guilty plea....' " *Montgomery v. United States*, 853 F.2d 83, 85 (2d Cir.1988), quoting *Godwin v. United States*, 687 F.2d 585, 590 (2d Cir.1982). The record establishes that by the time Judge Sifton accepted the guilty plea, Fama had provided the court with ample information to support the conclusion that Fama had managed or supervised five or more persons. Furthermore, Fama fully understood the elements of the CCE offense, as the court on several occasions either read the indictment to Fama verbatim or explained the elements of the crime.

On May 20, 1985, Fama stated that he had "managed" several people who "worked for me," and who on a monthly or weekly basis distributed the heroin he had bought. When the court inquired, "People who are customers, or people you managed or both," Fama responded,

> People I managed. People that I gave heroin to on consignment. The names are Joe, John, there is a Frank, Philip and then another Philip, a Bruno. I can't remember them all, your Honor, but there are more than five people there.

Then, with Fama still present, his attorney referred to these persons as "individuals who were subservient to Mr. Fama" and "among the five people that he supervised."

Fama mistakenly argues that the fact that these persons had been identified as "customers" before the grand jury by the government's expert, DEA Agent Strang, somehow undermines the factual basis for his plea. Fama and his counsel made it quite clear at the plea proceeding that these people, who distributed his heroin on consignment for their mutual benefit, were more than mere "customers." The reference to them as "customers" by a grand jury witness does not affect the adequacy of the factual basis presented to the court.

Fama also argues that his identification of these six individuals as persons he managed, instead of his five family members named as co-defendants, amounted to an impermissible "constructive amendment" of the indictment. However, the CCE count, to which Fama pled, merely alleged that he had organized, supervised, or managed "at least five (5) other persons," without specifying who they were. The CCE count also incorporated by reference the remaining counts, including Count 2 which charged Fama and his family, "together with others known and unknown to the grand jury," with conspiracy to possess and distribute. The six individuals named by Fama as persons he gave drugs to on consignment qualified as "others known and unknown."

Thus the indictment never stated that the only people Fama managed as part of the CCE were members of his family, and the court's acceptance of his guilty plea on the basis of an admission to managing five persons not in his family was in no way inconsistent with the indictment as handed up by the grand jury. Indeed, Fama's own counsel agreed with this position when, during the initial plea proceeding of April 22, 1985, he stated to the court that his client wished to plead guilty to the CCE count on the basis of five people other than members of his family, and specifically noted that the words of the indictment permitted it.

Fama's second claim is that the voluntariness of his plea was put in doubt by

Judge Sifton's alleged failure, prior to the court's final acceptance of the plea, to articulate the elements of the offense and to explain to him the full consequences of his guilty plea, including possible fines, forfeitures and restrictions on parole eligibility.

Fama's claimed lack of understanding of the elements of the CCE offense when he offered his final plea finds no support in the record. To the contrary, on April 22, 1985, Judge Sifton informed Fama of the charges against him by reading the CCE count from the indictment; on May 17, Judge Sifton again stated the elements of the CCE offense; and on May 20, the date on which Fama offered the plea in question and the court initially accepted it, Judge Sifton inquired in detail of Fama whether there was a factual basis for his plea to the CCE charge, including the existence of five persons managed by Fama, clearly indicating that Fama understood the elements of the CCE offense.

As for Fama's claimed lack of understanding of the penal consequences of his plea, a fair reading of the record shows this claim to be meritless as well. Moreover, the considerations that warrant this conclusion also refute Fama's argument that his plea agreement was violated by his receiving a $100,000 fine in alleged contravention of his "reasonable expectations" that no fine would be imposed.

■ On April 22, at the outset of the plea proceedings, Fama was fully informed that if he pleaded guilty to the CCE charge the government intended to seek forfeiture of the money seized on the day of his arrest, and that, although the agreement as it stood then provided for no fine, the offense itself carried a possible fine of up to $200,000. While it is true that the court never informed Fama of possible restrictions on parole eligibility, it was not required to do so. *See Hunter v. Fogg,* 616 F.2d 55, 61 (2d Cir.1980).

■ By the time Fama's plea was finally accepted, substantial changes were made to the original plea agreement, including the elimination of the no fine condition. Although Judge Sifton did not on May 20 explicitly list every condition of the original

agreement that was no longer in place, including the promise of no fine, he did make clear that the "only promise or agreement" that *was* in effect was the promise "that you will not be sentenced to more than twenty years in prison." Further, the court stated that the government was no longer making any commitment regarding tax prosecutions, prosecutions in the District of Maryland or the Southern District of New York, or "forfeiture proceeding against your residence," and finally stated that "none of the other promises previously made to you can ... be assured will be enforced in return for your pleading guilty."

Fama contends that he had understood the "twenty-year cap" on his sentence to encompass all other potential punishments that could be given, including the $100,000 fine, but the statements made by the court, Fama, and his counsel over the course of the several plea proceedings, coupled with the fact of Fama's representation by competent counsel, belie any claim of misunderstanding on this score. For instance, as his counsel explained on May 20, "He is taking this plea because he does not want an exposure of more than twenty years in prison."

On July 26, before sentencing, the court ruled on the motion made by Fama's counsel, which the court had invited, that several conditions from the earlier plea agreement should also be enforced against the government. During the course of that discussion, the court stated that it would enforce certain of the original provisions and would not enforce certain others, and did not mention the no fine provision. However, notwithstanding the court's silence, Fama's present claim that on that day he did not understand the consequences of his plea and in particular the possibility of a fine, is meritless. It was clear before July 26 that the no fine promise was no longer part of the agreement and nothing occurred on July 26 to alter that fact. On that day Fama's counsel had the opportunity to seek explicit enforcement of the no fine provision but did not do so. Most telling, however, is that after

Judge Sifton imposed a sentence that included the $100,000 fine and the direction of forfeiture, neither Fama nor his counsel objected.

■ Finally, Fama's claim that Judge Sifton impermissibly participated in plea agreement discussions must also fail. A fair assessment of the record is that Judge Sifton never imposed his views as to the substance of any of the agreement provisions at issue and never injected himself into the plea negotiation process. The court's rejection of the original agreement was entirely justified, and was based on its concerns regarding voluntariness and lack of a factual basis for the plea, not upon any disapproval of its terms. The more limited terms eventually agreed to were the product of negotiation between the government and defense counsel and were not influenced by the court. In sum, it is evident, upon a fair reading of the record, that Judge Sifton was involved in the plea discussions only in a procedural, supervisory role, and not in any substantive respect.

Judgment affirmed.